## Case No. 13,743.

### The TANGIER.

### PIERSON et al. v. RICHARDSON et al.

### [1 Cliff. 383.] 1

Circuit Court, D. Massachusetts.   May Term, 1860.

HOLIDAYS — "FAST DAY" — DELIVERY OF CARGO — MASSACHUSETTS.

1. Under the decision of the supreme court in Richardson v. Goddard, 23 How. [64 U. S.] 28, the master of a merchant vessel is fully authorized to continue and complete the discharge of his cargo, and the delivery of the respective consignments on fast-day, when he had commenced the work prior to the occurrence of that day.
[Cited in McAndrew v. Whitlock, 52 N. Y. 51.]

2. For the purpose of lading or unlading ships engaged in maritime commerce, it is also held that, in the absence of any statute to the contrary, or established general usage, fast-day must be considered as an ordinary working-day.

[Appeal from the district court of the United States for the district of Massachusetts.]

This was an admiralty appeal in a cause of contract, civil and maritime. The libellants [John H. Pierson and others] were the consignees of one hundred bales of cotton, shipped at Apalachicola, in the state of Florida, on board the bark Tangier, to be transported to Boston for a specified freight. On the 6th of April, 1856, the bark arrived in safety at the port of destination with the cargo on board; but the libel alleged that the cotton, excepting twenty-five bales, had not been delivered, and that the master neglected and refused to deliver the residue. Full performance on the part of the respondents [Samuel Richardson and others] was set up in the answer, and it was denied that the libellants had suffered any damage by reason of any neglect or refusal on the part of the owners or their agents. An amendment to the libel was subsequently filed, in which it was alleged that, on the 7th of April, 1856, the libellants received notice that some of their cotton was landed on the wharf; that they took all such away, except two bales, which were so covered up by other merchandise that they could not then be delivered, and that on the evening of that day the rest of their consignment

was still in the vessel, and not in a condition to be removed; that the libellants did not receive notice, and did not know that any more of their cotton had been discharged from the vessel, or was ready for delivery; that on the morning of the 11th of April the master of the bark informed them that the balance had been destroyed by fire, and that the claimants pretended that it had been taken out of the vessel the day previous and placed on the wharf, of which they were ignorant. As a further defence, the amendment alleged that if the libellants had received notice, they were still not bound to accept and receive the delivery of the residue on the day it was taken out of the vessel, because the 10th of that month had been set apart by the governor and council as a day of "public humiliation, fasting, and prayer," and that, by an immemorial custom and usage sanctioned by law, the annual fast-day of the state was a day on which no secular labor was performed. To the amended libel the respondents replied that libellants had notice of the intended discharge of the cargo on the 10th, and had assented thereto, and agreed to receive and take away their merchandise, and that there was no custom among persons engaged in commerce not to do any secular work on fast-day; but averred that the custom of the port authorized masters of vessels to discharge their cargoes, and that the libellants were bound to receive and take it away. A decree was entered in the district court dismissing the libel. [Case unreported.]

C. P. Curtis and C. P. Curtis, Jr., for libellants.

R. Choate and J. M. Bell, for respondents.

CLIFFORD, Circuit Justice. Notice was given to the libellants of the arrival of the vessel, and of the master's readiness to deliver the cotton at the same time, and by the same messenger who notified the other consignees. Some twenty-seven bales or more of the libellants' cotton were discharged on Monday and Tuesday, before the work was suspended by the stevedore. After the notice was received by the libellants, they employed a truckman to attend to the business of removing the cotton from the wharf, and gave him directions in regard to the whole consignment. None of the cotton, however, was removed on Monday, and on Tuesday they were again notified and told that the cotton was out and ready, and that the stevedore had been obliged to suspend the work because the wharf was blocked up. Failing to get the cotton removed, the master went to their counting-room on Wednesday morning, and told one of the firm that the cotton was lying on the wharf. On that occasion the truckman was sent for, and the master was referred to him for the necessary explanations; and, as an excuse for his remissness, he said, in effect, that

---

1 [Reported by William Henry Clifford, Esq., and here reprinted by permission.]

being much pressed with business, he supposed that he could delay this work for a while. He was examined as a witness, and testified that he went to the wharf on Tuesday, but found none of the cotton, except two bales, which were not accessible, and that he went again on Wednesday, after the interview at the counting-room, and took away twenty-five bales, which were all he could find on the wharf. Near sunset of that day the master says he saw the truckman on the wharf, and that the truckman told him that he would come the next day and take the cotton away, if the stevedore would put it on the wharf. But the truckman expressly denies that he ever held any such conversation. Be that as it may, it is nevertheless clearly to be inferred, from all the circumstances, that he must have known that the work of discharging the vessel would be resumed as soon as the obstacles which had occasioned it to be suspended were removed. All of the other facts respecting the unloading of the vessel are substantially the same as those exhibited in the case appealed to the supreme court. Assuming that Thursday was a suitable time for the unlading of the bark and for the delivery of the consignment, it is quite obvious that the acts performed by the master were fully equivalent to an actual delivery of the goods, within the principles laid down in that case. He gave due and reasonable notice of the arrival of the vessel, and of his readiness to deliver the consignment. All the goods were properly discharged from the vessel, and duly landed on a suitable wharf and at a suitable time, and the consignment was properly separated from the others, and the goods so placed upon the wharf as to be conveniently accessible for the purpose of removal. But it is insisted by the libellants that Thursday, being the annual fast of the state for that year, was not a suitable day for the performance of those acts; and that is the only remaining question to be considered. Much discrepancy exists in the testimony of the witnesses upon this point. Some affirm that the custom of the port is not to unlade, deliver, or receive goods on that day. Others state the proposition either with many exceptions or with material qualifications. But the weight of the evidence fully sustains the conclusion that there is no such general custom to abstain from labor on that day as forbids the master of a merchant vessel, in a case where he has previously commenced to discharge his vessel, from completing the unlading on fast day, and delivering the consignment. On the contrary, the evidence taken as a whole clearly shows that the custom is not to suspend under such circumstances, but that the stevedores almost invariably continue the work, and when practicable complete it. Such being the state of the evidence, it is clear that the question is closed by the decision of the supreme court. Richardson v. Goddard, 23 How. [64 U. S.] 28. Whatever differences of opinion there may be as to the true interpretation of the judgment of the court in that case, all must agree that the master of a merchant vessel, within the principles there laid down. is fully authorized to continue and complete the discharge of the cargo and the delivery of the respective consignments on fast-day, in a case where he had commenced the work prior to the occurrence of that day. To that extent the decision clearly goes; and in the judgment of this court it goes much further, and fully justifies the position assumed by the counsel of the respondents, that, for the purpose of lading or unlading ships engaged in maritime commerce, fast-day, in the absence of any statute to the contrary or established general usage, must be considered as an ordinary working-day. Nothing less can be inferred from the language of the court when they say: "This inquiry involves the right of the carrier to labor on that day and discharge cargo, and not the right of the consignee to keep a voluntary holiday, and to postpone the removal of the goods to his warehouse to a more convenient season. The policy of the law holds the carrier to a rigorous liability; and in the discharge of it he is not bound to await the convenience or accommodate himself to the caprice or conscientious scruples of the consignee. The master of the ship usually has a certain number of lay-days. He is bound to expedite the unlading of his vessel in order to relieve the owners from the expense of demurrage, and to liberate the ship from the onerous liability of the contract of affreightment as soon as possible. He has six days of the week in which to perform this task, and has a right to demand the acceptance of his freight by the consignee. The consignee may think proper to keep Saturday as his Sabbath, and to observe Friday as a fast-day, or other church festival, or he may postpone the removal of the goods because his warehouse is not in order to receive them; but he cannot exercise his rights at the expense of others, and compel the carrier to stand as an insurer of his property to suit his convenience or conscience." Other parts of the opinion are to the same effect, and even more decisive; as, for example, the court say: "The proclamation of the governor is but a recommendation. It had not the force of law, nor was it so intended. The duties of fasting and prayer are voluntary and not of compulsion, and holiday is a privilege and not a duty. In almost every state in the Union a day of thanksgiving is appointed in the fall of the year, by the governor, because there is no ecclesiastical authority which would be acknowledged by the different denominations. It is an excellent custom, but it binds no man's conscience, or requires him to abstain from labor. Nor is it necessary to a literal com-

pliance with the recommended fast-day, that all labor should cease, and the day be observed as a Sabbath or a holiday. It is not so treated by those who conscientiously observe every Friday as a fast-day." Having come to the conclusion that the question is controlled by the decision of the supreme court, it is unnecessary to enter into any further discussion upon the subject. It being understood that a new hearing was granted at the last term, the proper decree is, that the decree of the district court be affirmed, with costs.